UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | |
| : | Case No. 25-MJ-148-MAU |
| NATHALIE ROSE JONES, : | |
| : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION**

Defendant Nathalie Rose Jones (hereinafter "JONES") should be detained pending trial pursuant to 18 U.S.C. § 3142(f)(1)(A) (crime of violence) and (2)(A) (serious risk of flight). Defendant has spent years issuing violent threats—whether by phone, email, or on social media—towards the President of the United States ("POTUS"). She also lacks any residential, employment, or familial ties to the District of Columbia and, therefore, has ample reason to flee the jurisdiction if released. Accordingly, the United States respectfully requests the Court consider the following points and authorities, as well as any other information presented at the detention hearing, and order Defendant detained pending trial.

**FACTUAL BACKGROUND**

**A. Law Enforcement's First Encounter with Defendant**

On June 17, 2020, a female who identified herself as "Rose Jones" called the Office of the Director of National Intelligence's Public Affairs Hotline multiple times. During those calls, "Rose Jones" appeared to be in an intoxicated state, and she requested that the "intelligence community" stop her phone from ringing in the mornings during her "meditation time." According to a summary of the call, Ms. Rose was unhappy with the results of her complaint and became increasingly profane. At one point, the hotline operator asked Ms. Jones to stop calling, and Ms.

Jones uttered a threat about the POTUS. Specifically, Ms. Jones stated that "[she] should just kill [the POTUS] because he is racist" before hanging up.

On the same date the aforementioned threat was made, a special agent with the Central Intelligence Agency ("CIA") Threat Management Unit reported this encounter to the United States Secret Service ("USSS"). A search associated with the caller's phone number, which ends in 4223 (hereinafter the "4223 number") revealed the caller's identity to be Nathalie Rose Jones, with a specific date of birth and driver's license number.

### B. Defendant's Social Media Posts in Early August 2025

During the first two weeks of August 2025, Defendant began posting several messages about the POTUS on Instagram and Facebook. This included comments that the POTUS's administration was a "dictatorship"; that the POTUS should be removed for "terrorism" and causing "unnecessary loss of life"; and that the POTUS should be "dragged out." A sampling of those posts are depicted below for the Court's consideration:



2

*Figure 1: August 2, 2025, Instagram Post from "nath.jones[1]"*



*Figure 2: August 4, 2025, Instagram Post from "nath.jones"*

---

[1] At this time, the United States has been unable to confirm that Defendant is the owner of the "nath.jones" Instagram account. However, the same profile picture is used for both the "nath.jones" Instagram account and Defendant's Facebook account (the latter of which she admitted to owning). Furthermore, similar threatening content was posted on both accounts around the same time.

3

In one Facebook post from August 6, 2025, Defendant explicitly stated that she was willing to kill the POTUS. Specifically, Defendant noted, "I literally told FBI in five states today that I am willing to sacrificially kill this POTUS by disemboweling him and cutting out his trachea[.]" A screenshot of that message is depicted below:



*Figure 3: August 6, 2025, Facebook Post from "Nath Jones"*

In another Facebook post from August 13, 2025, Defendant ominously stated that she did not want to have "a war on The White House lawn" but that she had to press forward to prevent a "dictator" and "authoritarian regime." A screenshot of that message is depicted below:



*Figure 4: August 13, 2025, Facebook Post from "Nath Jones"*

Later in the day on August 13, 2025, Defendant posted on Facebook that the CIA should just "find him and drag his ass out and fuck him up infinity." A screenshot of that post is depicted below:



*Figure 5: August 13, 2025, Facebook Post from "Nath Jones"*

C. **August 14, 2025, Email from Nathorose@gmail.com & N.G. Report**

On or about August 14, 2025, at approximately 12:37 p.m., an email from nathorose@gmail.com was sent to several military, pharmaceutical, and governmental recipients.

On the signature line of the email, the sender identifies herself as "Nathalie Jones, RPh, Member of the American Society of Consultant Pharmacists."

In the body of the email, one can see that the sender has: (i) "planned an arrest and removal ceremony" of the POTUS as a "terrorist" on the American people "causing extreme loss of life"; and (ii) reported the POTUS to various law enforcement agencies and the "Supreme Court" as a "terrorist on the American people[.]"

Notably, the sender also makes the following threat to the POTUS, which is depicted in the below image:

> But now, I'm letting you know that I am available to kill this man at the old Cranberry Farm at Aberdeen Proving Ground after the ceremony at the White House by disemboweling him and cutting out his trachea, if you will recruit me CIA. Because this is personal. This is my business, my writing, my consulting in ASCP, my information as a Board Certified Geriatric Pharmacist, my friends from the Omnicare CIC tyrannized by US military, and our ideas for America taken, manipulated, and used to kill en masse. Well, no Mr. President. You will not take these actions with my information CIA. So, if you go back the other way on me? I will exercise the Golden Rule as a spiritual person and as a Christian.
>
> I am considering being in DC this Saturday August 16th, 2025.
>
> I can contain my blood lust and have, but what will you do with my information?
>
> I am available.
>
> Sincere Thanks,
>
> Nathalie Jones, RPh
> Member of the American Society of Consultant Pharmacists

*Figure 6: August 14, 2025, Email from "Nathalie Jones"*

As stated above, the sender indicates that she is available to kill the POTUS by "disemboweling him and cutting out his trachea." Additionally, the sender notes that she is considering going to Washington, DC, on August 16.

On or about August 14, 2025, at approximately 3:00 p.m., N.G. also made a report to law

7

enforcement that Defendant, utilizing the "nathorose@gmail.com" email address, made threats to "disembowel" the POTUS. According to N.G., this was the second time N.G. called law enforcement to report Defendant for threats towards the POTUS.

### D. Defendant's August 14, 2025, Facebook Post

On August 14, 2025, at approximately 9:17 p.m., Defendant posted the following image on her Facebook account "Nath Jones."



*Figure 7: Defendant's August 14, 2025, Facebook Post*

In this post, Defendant asks, "Who will die for this country?" and "Who will die for Freedom?" Defendant also posits whether such actions are "necessary at Dupont Circle at 2pm?"

As will be discussed in greater detail below, Defendant did in fact travel to the Dupont Circle area of Washington, DC, after making these comments.

### E. August 15, 2025, Email from Nathorose@gmail.com

On or about August 15, 2025, at approximately 5:07 a.m., another email from nathorose@gmail.com was sent to several military, pharmaceutical, and governmental recipients. On the signature line of the email, the sender identified herself as "Nath Jones" and gave the 4223 number.

> Good morning,
>
> I will head towards DC today to be there tomorrow.
>
> Our event hasn't come together as much as I had hoped but I will be there.
>
> Here is the thing. I have been attacked in every way. What defense do I have?
>
> But this country has been attacked by this POTUS in literally every way for ten years. No one man should have power like this.
>
> Will all my power be taken?
>
> I am asking for the Administration's removal as they are not acting by Oath or Affirmation.

> The fact that my power has been taken to the extreme that our ASCP patients have died en masse unnecessarily without their COVID vaccines is definitely something I will protest.
>
> I asked Pete Hegseth on Facebook to plan the removal ceremony from 10-2pm at the White House. But again I ask for this entire line of succession down to Chuck Schumer to be removed.
>
> They have killed our patients with terrorizing, manipulative, malign misinformation, knowing exactly what they are doing as Nazis for over five years, and allowing hundreds of thousands o the most vulnerable citizens in this country to die a horrible, unnecessary death of coronavirus
>
> Perhaps I will die an unnecessary death tomorrow in the fascist police state suppressing protest, but this is The Affirmation.
>
> Eric Dyitt, will you escort me to assure the one necessary death to free this country?
>
> Nath Jones

*Figure 8: August 15, 2025, Email from "Nath Jones"*

Notably, in this email, the sender again asked for the "Administration's removal," and further requested that Pete Hegseth, the United States Secretary of Defense, plan the "removal ceremony" at the White House. "Nath Jones" also referred to the POTUS's administration as "nazis" and she provided a warning that "[p]erhaps [she] will die an unnecessary death tomorrow in the fascist police state suppressing protest[.]"

**F. August 15, 2025, Meeting in New York**

On August 15, 2025, members of the USSS New York Regional Field Office requested a voluntary meeting with Defendant in New York. Law enforcement was tasked with speaking to Defendant given the threats she previously made towards the POTUS and her statement that she was considering traveling to Washington, DC, on August 16, 2025.

During the interview, Defendant stated that she: (i) fully intended on traveling to Washington, DC, later that evening; and (ii) planned on attending an event at the Jimmy Carter Presidential Library and Museum and a demonstration in Dupont Circle on August 16, 2025. Throughout the interview, Defendant threatened the POTUS's life and often referred to him as a

"terrorist" and a "nazi." At points during the discussion, Defendant did state that she hoped to peacefully remove the POTUS from his position. However, Defendant also noted that, if she had the opportunity, she would take the POTUS's life, stating "I will kill him out at the compound if I have to!" While Defendant denied having any firearms, she expressed that if she had access to a knife or bladed object, she would use the items to carry out her mission of killing the POTUS. Among other things, Defendant also provided the investigators with a residential address in New York.

### G. August 16, 2025, Meeting in Washington, DC

On or about August 16, 2025, members of the USSS learned that Defendant was now in the Washington, DC, area. Accordingly, at approximately 9:18 a.m. on that date, law enforcement contacted Defendant by using the 4223 number and requested another voluntary interview. Defendant agreed, and the parties met at Big Bear Café located in Washington, DC, later that morning.

During the interview, Defendant noted that: (i) on August 15, 2025, she left Manhattan, New York, and drove her car to Washington, DC; (ii) on July 8, 2020, she reported the POTUS to the CIA as a terrorist; (iii) she did not receive any feedback from the CIA after submitting her report and that, during the time of her 2020 complaint, she was working in Indiana as a pharmacist at CVS; (iv) she was disgruntled with the administration due to her disagreement with how they handled the vaccines during the Covid outbreak; (v) she travelled to Washington, DC, to "plan a dignified arrest ceremony" for the POTUS and would visit the White House to pay her respects to former First Lady Carter; and (vi) she had no intention of harming the POTUS during her visit.

The investigators asked Defendant about the "bladed object" she referenced during her August 15th, 2025, interview with law enforcement, and Defendant clarified that she did not have

11

any weapons, nor did she want to hurt the POTUS. Defendant did admit, however, that during her August 15th, 2025, interview with law enforcement, she had threatened the POTUS.

At the conclusion of the interview, Defendant allowed law enforcement to search her vehicle, which did not reveal any weapons or evidence of note.

### H.  Defendant's Actions After Meeting with the USSS on August 16, 2025

After meeting with the USSS on August 16, 2025, Defendant remained undeterred. Later that day, Defendant continued to make comments on social media that were hostile and threatening towards the POTUS. In one such post at 1:21 p.m. on that date, Defendant stated, among other things, that the POTUS's administration was a "Nazi regime" and that she "showed up to end it." A screenshot of the Facebook post is depicted below:



*Figure 9: August 16, 2025, Facebook Post by "Nath Jones"*

Law enforcement then observed that Defendant participated in the "No Fascist Takeover of DC! Trump Must go Now! demonstration that started at Dupont Circle in Washington, DC, circumnavigated the White Couse Complex, and concluded at the North Fence Line. At approximately 5:01 p.m. that day, Defendant was then arrested on Pennsylvania Avenue for violations of Title 18, United States Code, Sections 871 and 875.

Approximately twenty minutes after Defendant was arrested, she waived her Miranda rights and agreed to speak with law enforcement again. During the interview, members of the USSS showed Defendant several of her threatening Facebook posts, including the posts from August 6, 2025, and August 13, 2025 (Figures 3 and 5 respectively). Defendant then admitted to the investigators that she was the creator of those posts.

## PROCEDURAL HISTORY

On August 18, 2025, United States Magistrate Moxila A. Upadhyaya approved a federal criminal complaint against Defendant for the conduct described above, including violations of 18 U.S.C. §§ 871(a) (knowingly and willfully threatening to take the life of, kidnap, or inflict bodily harm upon the President of the United States) and 875(c) (transmit in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another). Defendant's initial appearance was held on August 19, 2025, where the United States moved for pretrial detention. The Court ordered Defendant held without bond pending a detention hearing set for August 21, 2025.

## ARGUMENT

Under the Bail Reform Act, if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [a defendant] as required and the safety of any other person and the community," the Court shall order a defendant held pending trial. 18 U.S.C.

13

§ 3142(e).

In determining whether any condition or combinations of conditions will assure the safety of the community, in light of any applicable presumptions, the Court weighs four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. 18 U.S.C. § 3142(g).

In making this determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted, and the United States may proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the United States is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *see also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device and cross-examination should be limited to the disputed issues. *See Smith*, 79 F.3d at 1210; *Williams*, 798 F. Supp. at 36.

A review and understanding of the facts and circumstances in this case demonstrate there are no conditions or combination of conditions that would reasonably ensure Defendant's appearance as required or protect the safety of any other person or the community if she is released. *See* PSR at 1. Accordingly, the Court should detain Defendant pending trial.

**A. The Nature and Circumstances of the Offense Support Detention.**

The first factor to be considered is the nature and circumstances of the offense charged, which weighs in favor of detention.

Defendant is charged with two violent crimes. *See, e.g., United States v. Choudhry*, 941 F.Supp.2d 347, 351 (E.D.N.Y. 2013) (noting that a violation of 18 U.S.C. § 875(c) constitutes a "crime of violence," warranting detention under the Bail Reform Act); *United States v. Batten*, No. 90-50525, 1991 WL 113736, *1 (9th Cir. 1991) (stating that a violation of 18 U.S.C. § 871 is a crime of violence). As noted in the factual background above, Defendant explicitly threatened the life of the POTUS on at least five separate occasions. These include Defendant's:

- June 17, 2020, phone call, to the Office of the Director of National Intelligence's Public Affairs Hotline, whereby Defendant stated, among other things, that "[she] should just kill [POTUS] because he is racist."

- August 6, 2025, Facebook post, which stated, among other things, "I am willing to sacrificially kill this POTUS by disemboweling him and cutting out his trachea[.]"

- August 14, 2025, email, which stated, among other things, "I am available to kill this man . . . by disemboweling him and cutting out his trachea[.]"

- August 14, 2025, report by N.G. that N.G. received an email from Defendant threating to "disembowel" the POTUS.

- August 15, 2025, interview, whereby Defendant stated, among other things, that: (i) if she had the opportunity, she would take the POTUS's life; (ii) she would "kill him out at the compound" if she had to; and (iii) if she had access to a knife or bladed object, she would use the items to carry out her mission of killing the POTUS.

In addition to the above-mentioned death threats, Defendant issued several ominous comments, such as the need to avoid "war," "bloodshed," and unnecessary death, and she requested that others injure the POTUS.

What makes Defendant's conduct extremely troubling is that she took steps in furtherance of these threatening comments and militaristic references. After meeting with law enforcement on August 15, 2025, and openly admitting that she desired to kill the POTUS, Defendant traveled to

Washington, DC, and ultimately went near the White House the next day.

The USSS recognized the serious nature of Defendant's conduct, and members of the agency surveilled her as soon as she left New York on August 15, 2025. Thanks to their efforts, Defendant was arrested on Pennsylvania Avenue in Washington, DC, before she could hurt the POTUS, an innocent bystander, or herself.

### B. The Weight of the Evidence Against Defendant is Formidable.

The second factor to be considered, the weight of the evidence, also weighs in favor of detention.[2] The United States's case against Defendant is strong. Defendant's threatening posts were made on her publicly available social media accounts. Defendant also made threats over the phone utilizing the 4223 number and through emails containing her signature. Finally, her in-person statements to law enforcement and her decision to drive to Washington, DC, after her August 15, 2025, interview, confirm that her online posts, phone call, and emails were not merely jokes, but true threats.[3] Therefore, the strength of the evidence against Defendant is strong and weighs in favor of detention.

### C. Defendant's History and Characteristics Merit Detention.

The third factor, Defendant's history and characteristics, weighs in favor of detention. To

---

[2] This factor should be equally weighed. In *United States v. Blackson*, following a thorough review of the text of § 3142 and decisions analyzing this factor, then Chief Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." No. 23-CR-25, 2023 WL 1778194, at *8 (D.D.C. Feb. 6, 2023). Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate." *Id.* at *10. In an unpublished opinion, the D.C. Circuit affirmed Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). The Second Circuit reached the same decision after a thorough and careful analysis of the issue. *United States v. Zhe Zhang*, 55 F.4th 141, 149-150 (2d Cir. 2022). The Court should follow *Blackson* and *Zhang*; this factor should be given no less weight than any other factor.

[3] Consequently, Defendant's chargeable conduct is also not protected by the First Amendment. *See, e.g., United States v. Li*, 537 F.Supp.2d 431, 434-35 (N.D.N.Y. 2008) (noting that, in the context of a § 875(c) prosecution, the United States need only prove that "the defendant intentionally transmitted a communication in interstate commerce and that the circumstances were such that an ordinary, reasonable recipient familiar with the context of the communication would interpret it as a true threat of injury[]").

begin, the United States would respectfully direct the Court to the United States's Sealed Supplemental Memorandum. Additionally, Defendant has no employment, familial, or residential ties to the District of Columbia. Defendant is currently a New York resident, and she previously lived in Indiana as evidenced by her driver's license. Consequently, Defendant has a strong motivation to flee the jurisdiction if released pending trial.

### D. Defendant Presents a Danger to Our Community.

The fourth and final factor, the danger to any person or the community posed by Defendant's release, similarly weighs in favor of detention.

The Court should be severely concerned about Defendant's future dangerousness if she were to be released pending trial. First, the nature of the charges filed against Defendant show her violent disposition. For years, Defendant made threats about killing and injuring the head of the United States's government. These were intentional comments that an ordinary, reasonable person, would interpret as a true threat. This is only strengthened by the fact that civilians and members of the law enforcement community reported Defendant's conduct to the USSS.

Second, Defendant's conduct shows that she does not care about the consequences of her actions. If she did, why would she post her threats for the world to see on her publicly available social media page? Why would she openly admit to law enforcement on August 15, 2025, that she wanted to kill the POTUS, and then drive to Washington, DC, the next day? If Defendant were released on conditions, there is no reason to believe she would follow them and refrain from potentially harming herself or someone else.

Third, the United States would again direct the Court's attention to its sealed Supplemental Memorandum, which provides further support for the notion that Defendant is a danger to others and herself.

17

Therefore, this factor weighs in favor of detention.

## CONCLUSION

There is no condition or combination of conditions that would ensure Defendant's compliance with court-ordered release conditions. As Defendant's offense conduct makes clear, she is a danger to the community and herself, and she poses a serious risk of flight. For all the foregoing reasons, the United States respectfully requests the Court detain Defendant pending trial.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:   */s/ Joshua Satter*
Joshua Satter
Assistant United States Attorney
NY Bar No. 5477112
601 D Street NW
Washington, DC 20579
(202) 252-7566
Josh.Satter@usdoj.gov